## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

UNITED STATES OF AMERICA,

     Plaintiff,

     v.

CASE NO. 6:13-cv- 1147-oRL- 37-KRS

2003 SOCATA TBM 700 BEARING
U.S. REGISTRATION N6720Y,

     Defendant.

### VERIFIED COMPLAINT FOR FORFEITURE *IN REM*

Plaintiff, United States of America, by and through the undersigned

Assistant United States Attorney, brings this complaint and alleges upon

information and belief, in accordance with Supplemental Rule G(2),

Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture

Actions, as follows:

### NATURE OF THE ACTION

1.    This is a civil action *in rem* to forfeit to the United States, pursuant

to 21 U.S.C. § 881(a)(6), a 2003 Socata TBM 700 Bearing U.S. Registration

N6720Y (Defendant Aircraft) because it was purchased with: 1) proceeds

traceable to a controlled substance exchange in violation of the Controlled

Substances Act; and/or 2) money used or intended to be used to facilitate a

violation of the Controlled Substances Act.

## JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction over an action commenced by the United States by virtue of 28 U.S.C. § 1345, and over an action for forfeiture by virtue of 28 U.S.C. § 1355.

3.      This Court has *in rem* jurisdiction over the Defendant Aircraft pursuant to:

        a.      28 U.S.C. § 1355(b)(1)(B), because venue properly lies in the Middle District of Florida pursuant to 28 U.S.C. § 1395.

4.      Venue is proper in the District Court for the Middle District of Florida, pursuant to 28 U.S.C. § 1355(b)(2), because the property subject to forfeiture was found in this district.

## THE DEFENDANT *IN REM*

5.      The defendant property is a 2003 Socata TBM 700 Bearing U.S. Registration N6720Y which was seized by the Department of Homeland Security, Homeland Security Investigations (HSI) on or about November 21, 2012 in Deland, Florida after a probable cause finding that the Defendant Aircraft was subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6).  The Defendant Aircraft is currently located in the Southern District of Florida at a secure storage facility in the custody and control of HSI.

## JURISDICTION AND VENUE

2.     This Court has subject matter jurisdiction over an action commenced by the United States by virtue of 28 U.S.C. § 1345, and over an action for forfeiture by virtue of 28 U.S.C. § 1355.

3.     This Court has *in rem* jurisdiction over the Defendant Aircraft pursuant to:

      a.     28 U.S.C. § 1355(b)(1)(B), because venue properly lies in the Middle District of Florida pursuant to 28 U.S.C. § 1395.

4.     Venue is proper in the District Court for the Middle District of Florida, pursuant to 28 U.S.C. § 1355(b)(2), because the property subject to forfeiture was found in this district.

## THE DEFENDANT *IN REM*

5.     The defendant property is a 2003 Socata TBM 700 Bearing U.S. Registration N6720Y which was seized by the Department of Homeland Security, Homeland Security Investigations (HSI) on or about November 21, 2012 in Deland, Florida after a probable cause finding that the Defendant Aircraft was subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6).  The Defendant Aircraft is currently located in the Southern District of Florida at a secure storage facility in the custody and control of HSI.

6.     As set forth in Supplemental Rule G(3)(b)(i), the Clerk must issue a warrant to arrest Defendant Aircraft because it is in the government's possession, custody, or control.[1]

## BASIS FOR FORFEITURE

7.     The Defendant Aircraft is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6), because it was purchased with: 1) proceeds traceable to a controlled substance exchange in violation of the Controlled Substances Act; and/or 2) money used or intended to be used to facilitate a violation of the Controlled Substances Act.

## FACTS

8.     Specific details of the facts and circumstances supporting the forfeiture of the Defendant Aircraft are contained in the Affidavit of HSI Special Agent Ryan Gorman, which is attached hereto as Exhibit A and fully incorporated herein by reference.

9.     As required by Supp'l Rule G(2)(f), this complaint supports a reasonable belief that the government will be able to meet its burden of proof at trial.  Specifically, for the reasons set forth in the attached affidavit, probable cause exists to believe that the Defendant Aircraft was purchased with: 1) proceeds traceable to a controlled substance exchange in violation of the

---

[1]  In this regard, however, Supp'l Rule G is inconsistent with the current Local Admiralty Rule 7.03(b)(1), that requires a judicial officer to first review the verified complaint, and any other relevant case papers, prior to the Clerk issuing the warrant of arrest and/or summons *in rem*.

Controlled Substances Act; and/or 2) money used or intended to be used to facilitate a violation of the Controlled Substances Act. Thus, the Defendant Aircraft is subject to forfeiture to the United States under 21 U.S.C. § 881(a)(6).

WHEREFORE, the United States requests that process, in accordance with the provisions of Supplemental Rule G, be issued against the Defendant Aircraft to enforce the forfeiture and that any person or persons having an interest therein be cited and directed to appear and show cause why it should not be decreed; and that the Defendant Aircraft be forfeited to the United States for disposition according to law; and that the United States have such other and further relief as this case may require.

Respectfully submitted,

A. LEE BENTLEY, III
Acting United States Attorney

By:

**Nicole M. Andrejko**
Assistant United States Attorney
Florida Bar No. 0820601
400 West Washington St., Suite 3100
Orlando, FL 32801
Telephone: (407) 648-7500
Facsimile: (407) 648-7643
E-mail: Nicole.Andrejko@usdoj.gov

## VERIFICATION

I, Ryan Gorman, hereby verify and declare under penalty of perjury as provided by 28 U.S.C. § 1746 that I am a Special Agent with the Department of Homeland Security, Homeland Security Investigations, that I have read the foregoing Verified Complaint *in rem* and know the contents thereof, and that the matters contained in the Verified Complaint are true and correct to my own knowledge, except those matters herein stated to be alleged on information and belief and, as to those matters, I believe them to be true and correct.

The sources of my knowledge and information, and the grounds of my belief are the official files and records of the United States, information supplied to me by other law enforcement officers, as well as my investigation of this case and other cases.

Executed this ___80___ day of July, 2013.

Ryan Gorman, Special Agent
Department of Homeland Security,
Homeland Security Investigations

## AFFIDAVIT

I, Special Agent Ryan Gorman, being duly sworn, state as follow:

### Agent's Background

1.      I am a Special Agent with the Department of Homeland Security, Homeland Security Investigations (HSI). I have been so employed since March 27, 2006. I previously served six years with United States Customs and Border Protection and five years with the United States Coast Guard. I am currently assigned to the Assistant Special Agent in Charge, Orlando, Florida, Financial Investigations Group. As part of my official duties, I investigate criminal violations of the United States Code to include violations of the Controlled Substances Act (Title 21) and Money Laundering (18 USC 1956 and 1957).

2.      I attended the Federal Law Enforcement Training Center located in Brunswick, Georgia where I received training courses relating to the operation of Drug Trafficking Organizations and other criminal enterprises to include money laundering.

3.      I am familiar with the operation of multinational illegal drug trafficking organizations in Latin America, the Caribbean, and in other places in the United States. I have participated in court-ordered interceptions of wire communications involving landline and cellular telephones. I am familiar with the ways in which many criminal gangs and narcotic traffickers conduct their criminal enterprises which includes the methods of importing and distributing narcotics, money laundering, and the use of aircraft and vessels to facilitate their illegal acts.

4.      During my employment as a Special Agent, I have received instruction and training from other drug and narcotics investigators, supervisors, instructors,

prosecutors, and informants involving the operational structure of organizations which distribute narcotics or other dangerous drugs, such as, but not limited to, heroin, methamphetamine, ecstasy, marijuana, and cocaine. I have also received training on how these organizations launder monetary instruments.

5.    The facts set forth in this affidavit are based on my own personal knowledge, knowledge obtained from other law enforcement officers, reviews of documents and computer records related to this investigation, communications with others who have personal knowledge of the events and circumstances described herein and information gained through my training and experience and the training and experience of others. Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of the attached civil forfeiture complaint, it does not set forth each and every fact that I, or others, have learned during the course of the investigation.

### Property to be Forfeited

6.    This affidavit is made in support of a civil forfeiture complaint against a 2003 Socata TBM 700 bearing U.S. registration N6720Y registered to Aircraft Guaranty Corporation Trust, which was seized on November 21, 2012, in Deland, Florida.

### Background on Aircraft Registration Requirements

7.    The Federal Aviation Administration (FAA) is charged with, inter alia, regulating civil aviation to promote air safety, registering aircraft and recording documents reflecting title or interest in aircraft and their parts.

8.    According to the FAA, in order to register an aircraft, an applicant must send the following documents to the Aircraft Registration Branch in Oklahoma: 1) an

2

Aircraft Registration Application (AC Form's 8050-1), 2) evidence of ownership, such as a bill of sale, (FAA Form AC 8050-2); and 3) a $5.00 registration fee made payable to the FAA.  Pursuant to FAA guidelines, the purchaser is the responsible entity for submitting the Aircraft Registration Application.  Upon completion of a sale, if the purchaser intends to operate the aircraft, the purchaser must submit a Form AC 8050-1 – Aircraft Registration Application – to the FAA Aircraft Registration Branch.  The AC Form 8050-1 is a two-part form comprised of a white original with pink copy.  The white original is submitted to FAA Registry and the pink copy goes in the aircraft as temporary registration.  Once a copy of the Form AC 8050-1 is submitted to the FAA Registration Branch, then the purchaser is authorized to lawfully operate the aircraft for a period not to exceed 90 days.

9.      Based upon the information contained on the Form AC 8050-1, the FAA determines whether the eligibility requirements for a Certificate of Registration have been met.  If so, the FAA will, as a matter of course, issue a Certificate of Registration to the applicant for the aircraft.

10.     Once an aircraft is legally registered with the FAA, it will be given a designated identification number commonly referred to as a "tail number."  All U.S. registered aircraft are designated by the prefix "N", *e.g.* N123AB.  This "N" registration must be displayed on the aircraft and is oftentimes painted on the tail of the aircraft.

11.     The FAA has a set of regulations outlining who can register an aircraft. Specifically, any aircraft registered with the FAA must be owned by a United States citizen or U.S. lawful permanent resident alien.  Other entities may qualify as a "U.S. citizen" for purposes of registering an aircraft with the FAA.  They are as follows: 1) a

3

trust with one or more trustees, all of whom must be U.S. citizens;[1] 2) a corporation organized under the laws of one of the states within the United States, where the president is a U.S. citizen, two-thirds or more of the board of directors, or any other managing officers, are U.S. citizens, and where a minimum of 75 percent of the voting interest is owned or controlled by persons who are U.S. citizens; 3) a limited liability company organized under the laws of one of the states within the United States, where the manager(s) or president is a U.S. citizen, two-thirds or more of the appointed officers and/or the designated managers are U.S. citizens, and where a minimum of 75 percent of the membership voting interest is owned or controlled by persons who are U.S. citizens; or 4) a partnership where each partner is a citizen of the United States.

12.     Based upon my training and experience with air smuggling investigations, I am aware that individuals often use fictitious names, aliases, or third party nominees to register aircraft involved with illegal activity in order to conceal the true ownership of the aircraft, which is oftentimes a non-U.S. citizen.

### Investigation

I.    **Background**

    A.    **Jose Mauricio De Leon Sanchez – Broker for Aircraft Used in Narcotics Smuggling Operations**

13.     During this investigation, I learned from HSI Special Agent James Justet that Jose Mauricio De Leon Sanchez, a/k/a, Mauricio De Leon, (De Leon) was identified as an aircraft broker during a narcotics smuggling investigation, which resulted in the

---

[1]   Based upon my training, experience and this investigation, as a way for a foreign entity to avoid the U.S. citizenship requirements to register an aircraft with the FAA, a trust is established for ownership purposes, but then the aircraft is leased to a foreign entity for operation. The entity, either an individual or company, "leasing" the aircraft is then usually classified as the beneficiary of the trust.

arrest, extradition, and conviction of a Mexican national, Osiel Cardenas-Guillen, the former head of the Gulf Cartel, on federal drug charges. *See United States v. Osiel Cardenas-Guillen,* Case No. 1:92-cr-00214. In that action, Cardenas-Guillen forfeited three helicopters as part of his plea agreement because he admitted that the helicopters were purchased with drug proceeds and titled to nominees. *See id.* at Doc. 23.

14.    I have reviewed documents obtained from Insured Aircraft Title Service and U.S. Aircraft Titles, Inc. relative to the purchase of the helicopters forfeited by Cardenas-Guillen. Specifically, documents provided by these entities indicate that De Leon served as the purchasing agent of one of the helicopters forfeited in the above action, a Bell 407 bearing South African registration, ZS RKC and serial number 53255.

15.    Interestingly, subsequent to the discovery of De Leon's involvement with the purchase of the helicopters, HSI agents attempted to locate and interview him. According to a report prepared by a HSI agent on May 12, 2011, local police attempted to locate De Leon at his crop dusting business, Saesa, located in Tampico, Tamaulipas, Mexico. However, the local police found that Saesa was closed and the whereabouts of De Leon were unknown.

16.    Agents have located additional aircraft suspected to be used for narcotics smuggling operations where De Leon served as the broker in the purchase of the aircraft:

### 1.    Plane #1

17.    On March 26, 2012, while on routine assignment at the Deland, Florida Municipal Airport, I observed a transient Beech C-90 turbo prop aircraft bearing U.S. registration N311SR (Plane #1) located within an open hangar at the City of Deland

5

Fixed Base Operator.  Based upon my training, experience and this investigation, I am aware that drug traffickers often employ this type of aircraft to smuggle narcotics due, in part, to the aircraft's ability to land and take off on clandestine[2] runways and because this aircraft can carry a reasonably large amount of cargo and fuel.

18.     As a result of sighting Plane #1, I contacted FAA Special Agent Steve Tochterman and requested information pertaining to the registration of this aircraft.  SA Tochterman retrieved documents on file with the FAA and advised me that Plane #1 was registered with the FAA on January 27, 2012, to an individual named Raul Espinoza.  Raul Espinoza's listed address on the aircraft's registration was 1124 International Boulevard, Suite 600-245 Hidalgo, TX 78557.

19.     Through information obtained from the FAA pertaining to the registration of Plane #1, I identified Aero Space Reports, an Oklahoma City based aircraft title and escrow company, as having facilitated the sale of Plane #1 to Raul Espinoza.  Records obtained from Aero Space Reports reflect that, beginning in November 2011 and continuing through February 2012, an individual identified as "Mauricio De Leon" utilized an email address of saesa35@hotmail.com ("De Leon's Hotmail account") to correspond with Aero Space Reports.  Documents obtained from Aero Space Reports also reflect that De Leon represented the buyer of Plane #1 – Raul Espinoza – in the purchase of the aircraft.

---

[2]  Clandestine runways are usually dirt or grass airstrips located in the jungle or other rural areas.  They are not annotated on legitimate navigational charts or officially recognized by the International Civil Aviation Organization (ICAO).  The ICAO is responsible for annotating legitimate airports on charts used by pilots internationally.

20.     I reviewed the Bill of Sale (Forms 8050-2) for Plane #1.  The Bill of Sale indicates that Plane #1 was purchased on January 27, 2012 by Raul Espinoza for $117,978.00.

21.     The documents provided by Aero Space Reports for the sale/purchase of Plane #1 included an Escrow Settlement Sheet, dated January 27, 2012, that indicates the funds deposited into escrow on behalf of Raul Espinoza were received via wire transfers from two Mexican companies identified as Constructora Y Manta Nimiento and Multiservicios Profe Sionlaes.

22.     Specifically, on December 2, 2011, Aero Space Reports received one wire transfer of $47,500 from Constructora Y Manta Nimiento.  Thereafter, Aero Space Reports received three wire transfers from Multiservicios Profe Sionlaes on January 5, 2012, January 12, 2012, and January 20, 2012 in the amounts of $30,000, $35,000, and $5,298, respectively.

23.     Based upon my training, experience, and this investigation, I am aware that narcotics traffickers often purchase aircraft with multiple wire transfers from different and seemingly unrelated sources.  This is due, in part, because narcotics smugglers try to hide or conceal the true source of the funds being used to purchase the aircraft.  This can also be the result of narcotics proceeds being generated in various international markets throughout the world and collected in the predominant currency of a particular region (e.g., an individual in Europe may purchase narcotics utilizing the Euro whereas an individual in Asia may purchase narcotics utilizing the Yen).  Once the proceeds are collected, they are then often introduced into the global banking system through multiple entities and bank accounts and subsequently returned to the narcotics

supplier(s), either directly, or indirectly, through the purchase of goods or services for the benefit of the narcotics supplier.

24.     Further investigation revealed that Raul Espinoza is a Mexican National. However, Raul Espinoza indicated that he was a U.S. citizen on the paperwork submitted to the FAA to maintain the aircraft's registration.  As a result, Plane #1 is illegally registered and Raul Espinoza's ownership of the aircraft is in violation of federal law because foreign nationals cannot maintain ownership of U.S. registered aircraft. *See* 49 U.S.C. § 46306(b)(4).  Plane #1 was subsequently taken to Mexico and I have not been able to locate this aircraft since it left the country.

a.     Plane #2

25.     SA Tochterman further identified a Cessna 404 bearing U.S. registration N41SA (Plane #2) that was registered to Raul Espino_sa_ on June 11, 2011.  Although the spelling of the name differs, the address listed for Raul Espinosa on the aircraft's registration is also 1124 International Boulevard, Suite 600-245, Hidalgo, TX 78557.[3]

26.     I reviewed the Bill of Sale for Plane #2.  Plane #2 was purchased on June 1, 2011 by Raul Espinosa.  Based on the exact match of the registration address and the misspelling of Espinoza's name by only one letter (s/z), agents believe Raul Espino_z_a is the owner of Plane #2.  If true, Plane #2 is also illegally registered.

27.     Based upon my training and experience, this type of aircraft is also attractive to narcotics traffickers to haul narcotics.

---

[3]  On November 16, 2012, HSI Special Agent Nathan Brigmon identified this address as a business named Express Services.  According to its website, http://ampc.org/store/express_services, Express Services provides shipping and mailing services, as well as mailbox rentals.  Express Services is located in close proximity to the U.S. border with Mexico and is located in a strip mall type facility.

### 2.   Plane #3

28.   SA Tochterman also identified a third aircraft sold to Raul Espinoza, a Cessna 421 aircraft bearing U.S. registration N421BE (Plane #3). The Bill of Sale for this aircraft is dated August 10, 2006 and reflects that Plane #3 was sold to Servicios de Asesoria y Aeronautica Especializados SA de CV, a Mexican corporation.

29.   Thereafter, on October 1, 2006, Servicios de Asesoria y Aeronautica Especializados SA de CV sold Plane #3 to Aircraft Guaranty, an aircraft trust company located in Onalaska, Texas. This Bill of Sale reflects that "Jose Maurico De Leon Sanchez" signed as the president of Servicios de Asesoria y Aeronautica Especializados SA de CV.

30.   Continent Aircraft Trust #864 was established on or about September 20, 2006 in the Cayman Islands by Aircraft Guaranty for the purpose of owning Plane #3. Records obtained from Aircraft Guaranty reflect two documents relative to the ownership of Plane #3. These documents are known as Accession Agreements.[4]

31.   The first Accession Agreement, dated September 20, 2006, lists the beneficiary of Continent Aircraft Trust #864 as "Servicios de Asesoriay Aeronautica Especializados, S.A. de C.V." and was signed by "Mauricio De Leon." "Mr. Jose Mauricio de Leon Sanchez, President of Servicios de Asesoriay Aeronautica Especializados" was printed just below the signature line.

32.   However, the second Accession Agreement, dated October 6, 2010, identifies Raul Espinoza Almaguer as the beneficiary of Continent Aircraft Trust #864.

---

[4]   An Accession Agreement is used when ownership of a trust is transferred from one beneficiary to another. The Accession Agreement serves to document the acts for this transfer and sets forth agreements that all parties must abide by.

The agreement was signed by "Raul Espinoza," but "Raul Espinoza Almaguer" was printed just below the signature line.

33.    I also reviewed an Aircraft Lease Agreement dated October 6, 2010. On this agreement, Raul Espinoza Almaguer was identified as the lessee of Plane #3 with an address of 1124 International Blvd, Suite 600-245, Hidalgo, Texas 78557. Notably, the signatures for Raul Espinoza on the second Accession Agreement and the Aircraft Lease Agreement for Plane #3 are significantly different than those noted on the registration and Bills of Sale for Plane #1 and #2, but the addresses listed for him on these documents are all the same.

### 3.    Plane #4

#### a.    Purchase of Plane #4

34.    On August 29, 2012, I contacted Aero Space Reports, the escrow company that facilitated the purchase and sale of Plane #4. Documents obtained from Aero Space Reports show that on May 3, 2012, Raul Espinoza purchased Plane #4 and registered it on May 7, 2012. Raul Espinoza again listed his address as 1124 International Blvd., Suite 600-245, Hildago, TX on the aircraft registration.

35.    I also reviewed an escrow worksheet that reflects the deposits received by Aero Space Reports for the purchase of Plane #4. Four wire transfers were sent from Multiservicios Profe Sionlaes (Plane #1) from Banco Mercantil del Norte as follows: April 10, 2012 in the amount of $45,000; April 27, 2012 in the amount of $100,000; April 30, 2012 in the amount of $100,000; and May 1, 2012 in the amount of $105,000.

36.    FAA SA Steve Tochterman spoke with De Leon on October 8, 2012. SA Tochterman provided me with a copy of a report he prepared of this interview, which I

reviewed. During this interview, De Leon indicated that he had never met Raul Espinoza. De Leon further indicated that he did not act as the broker for Plane #4 and only handled the contact with the title company in Oklahoma regarding liens on the aircraft and other escrow issues. De Leon stated that he did not get involved with the purchase, but stated that Plane #4 was purchased for $375,000.00.

37.     However, I spoke with an escrow agent from Aero Space Reports who confirmed that De Leon represented Raul Espinoza in the purchase of Plane #4 and I received e-mails from Aero Space Reports indicating that De Leon assisted in the transfer of money used to purchase this aircraft. Aero Space Reports also provided e-mail correspondence from April 19, 2012, wherein De Leon identifies Raul Espinoza as a U.S. citizen.

### b.     Use of Plane #4 to Deliver Drugs to Guatemala

38.     On August 29, 2012, I spoke with DEA SA Paul Cohen. SA Cohen advised me that on August 21, 2012, a Piper Cheyenne aircraft, bearing U.S. registration N373Q (Plane #4) was observed[5] by U.S. law enforcement as it delivered what authorities believe to be a load of narcotics from the Apure region of Venezuela to a remote clandestine airstrip in Guatemala. Based upon my training, experience and this investigation, I am aware that Venezuela is a major source city for cocaine.

39.     I watched the video footage obtained from Plane #4's landing in Guatemala on what I believe, based upon my training and experience, to be a

---

[5] A HSI law enforcement surveillance aircraft was on scene and captured video footage of Plane #4 landing in Guatemala.

clandestine grass airstrip near the ocean.[6] Plane #4 was met by approximately eight vehicles that parked within feet of the aircraft. A number of individuals could be seen exiting their vehicles, approaching Plane #4 and then quickly returning to their vehicles. The time on the video reflected that the vehicles arrived at approximately 06:49:31 and, at approximately 06:54:24, four of the vehicles could be seen departing the aircraft at a high rate of speed and eventually disappearing into the countryside. Based upon the fact that Plane #4 landed on a clandestine airstrip, and the activity that occurred once the aircraft landed, I believe that Plane #4 was used to deliver drugs to Guatemala.

40.     SA Cohen also provided me with photos taken by DEA agents of Plane #4 subsequent to its landing, after it was abandoned. I noticed that the tail number of Plane #4 (N373Q) appeared to be painted over. However, I was told by FAA SA Tochterman, who is familiar with this case, that the tail number was visible, but only up close to the naked eye. Based upon my training, experience, and this investigation, I am aware that concealing the tail number of an aircraft is a common tactic used by narcotics smugglers to conceal the identity of an aircraft during flight so that the aircraft is unidentifiable to surveillance aircraft and/or law enforcement. Indeed, U.S. surveillance aircraft tasked with monitoring the drug transit zones in Central and South America have no authority to land in those areas. As a result, this often leaves U.S. law

---

[6] There were no other buildings, hangars, lights, or aircraft anywhere nearby which would indicate this was a legitimate airstrip. In addition, DEA agents located several items on the scene, including a generator, a DC to AC power converter, barrels for aviation fuel, and lighting. Based upon my training, experience and this investigation, these materials are consistent with the items need for a landing at a clandestine landing strip. Specifically, I believe the lighting was going to be used to light the grass airstrip to assist the pilot in locating the airfield and the barrels of fuel would be used to refuel Plane #4 so it would not need to go to a legitimate airstrip to refuel before leaving Guatemala.

enforcement with only video of the make and model of the aircraft being pursued. However, in this matter, U.S. law enforcement were able to respond to the scene and examine the aircraft, thereby allowing for the up close examination of the tail number in order to identify the owners of the aircraft.

41.     Additionally, SA Cohen provided me with a picture discovered inside Plane #4 after it was abandoned. The picture showed an invoice for an online clothing purchase made from solestruck.com. More specifically, the invoice indicated that two purchases were shipped to an "Oscar Galindo" at the address of 1124 International Blvd, Suite 600-6, Hidalgo, TX 78557. The date on the invoice was April 30, 2012.

42.     I conducted research in the Treasury Enforcement Communications System database and identified five international border crossings where De Leon traveled with Oscar Galindo via private aircraft on May 26, 2006, September 15, 2006, February 27, 2008, May 1, 2008 and February 26, 2009. For the travel that occurred on September 15, 2006, Galindo and De Leon were passengers onboard Plane #3 when Plane #3 entered the United States from Mexico. I also located two Currency Transaction Reports[7] which reflect that Oscar Galindo deposited cash ($20,000 on August 24, 2005 and $22,000 on January 5, 2006) at the International Bank in McAllen, TX. The address listed for Oscar Galindo on both transactions was 1124 International

---

[7]  Pursuant to 31 U.S.C. § 5313 and 31 C.F.R. § 103 of the Bank Secrecy Act require any financial institution that engages with a customer in a currency transaction (i.e., a deposit or withdrawal) in excess of $10,000 to report the transaction to the IRS on Form 4789, Currency Transaction Report (CTR). These regulations also require that multiple transactions be treated as a single transaction if the financial institution has knowledge that they are by, or on behalf of, the same person, and they result in currency either received or disbursed by the financial institution totaling more than $10,000 during any one business day. CTRs are often used by law enforcement to uncover a wide variety of illegal activities, including money laundering.

Boulevard, Hidalgo, TX.  The first CTR indicated that it was being completed on behalf of "Jose M DE LEON," whose address was listed as 1124 International Boulevard, Suite 60, Hidalgo, TX 78557.   Interestingly, on the second CTR, Oscar Galindo listed his occupation as an administrative assistant.

## Purchase of Plane Sought for Forfeiture

I.     **Ownership of Plane Sought for Forfeiture (Plane #5)**

43.     In August of 2012, I learned from Aero Space Reports that a 2003 Socata TBM 700 bearing U.S. registration N6720Y (Plane #5) was brokered by De Leon.  Aero Space Reports provided me with an Aircraft Purchase Agreement that indicated that Plane #5 was purchased by Fausto Veliz Urbina for $1,685,000 and then registered using Aircraft Guaranty.  The current registered owner for Aircraft #5 is Aircraft Guaranty under a trust with the beneficiary of the trust being a Mexican company, Consorcio Melun S.A. De C.V., whose legal representative is Fausto Veliz Urbina.

44.     Aero Space Reports provided me with an "Engagement Data Form" dated July 10, 2012.  This is a document that Aircraft Guaranty utilizes to input information to begin the process of compiling information needed to establish an aircraft trust.  The information contained on the Engagement Data Form is supplied by the client and shows who the client is, or who represents the client.

45.     On this document, De Leon listed the address for his company, Servicios Aeros Agricolas y Forestales de Mexico S.A. de C.V., as 1124 International Blvd, Suite 600-6, Hidalgo, TX 78557, the same address listed on the invoice found inside Plane #4. Also on the Engagement Data Form, the names Fausto Veliz and Guillermo Torres

Arce were identified as the operator/signing authority for Plane #5. The information on the Engagement Data Form was hand written and signed by De Leon.

46.     The aforementioned Engagement Data Form was submitted to Aircraft Guaranty on or about August 29, 2012 by Carlos Teran. However, the handwriting on the form was deemed "not completely legible" by Aircraft Guaranty. Because of this, Aircraft Guaranty requested, among other things, a new form and that clear color scanned copies of passports be submitted for both signatories – Fausto Veliz and Guillermo Torres Arce.

47.     As a result, a second Engagement Data Form was submitted to Aircraft Guaranty by Carlos Teran on August 30, 2012. Again, this Engagement Data Form identified the beneficiary of the trust as Consorcio Melun S.A. De C.V., but it only identified Fausto Veliz Urbina as the legal representative and signing authority for this company. On August 30, 2012, Aircraft Guaranty acknowledged receipt of this form.

48.     On August 30, 2012, Carlos Teran sent a second email with the additional information requested from Aircraft Guaranty. This email also included De Leon on the "to" line and contained the following attachments: 1) a legal document that served as proof of the existence of Consorcio Melun S.A. De C.V., 2) proof that Consorcio Melun S.A. De C.V. is registered in the Mexican state of Jalisco, 3) a tax registry and tax ID for Consorcio Melun S.A. De C.V., and 4) a scanned color copy of Fausto Veliz Urbina's passport.

A.     **Fausto Veliz Urbina**

49.     I conducted queries in DHS and other law enforcement databases and discovered that Fausto Veliz Urbina is a Mexican national who was convicted in 2005

15

on federal cocaine trafficking charges. *See United States v. Fausto Veliz Urbina*, Case

No. 4:04CR00358-001. Specifically, I ordered the Alien File (A-file) for Fausto Veliz

Urbina, which was designated as A-file number 079136477. Within this A-file was a

picture of Fausto Veliz Urbina and a certified copy of his Judgment filed in United States

District Court in the Southern District of Texas. I noted that on October 26, 2004,

Fausto Veliz Urbina pled guilty to violations of 21 U.S.C. § 841(a)(1),(b)(1)(A)

(Conspiracy to possess with intent to distribute 5 kilograms or more of cocaine) and

(Possession with intent to distribute 5 kilograms or more of cocaine) and 18 U.S.C. § 2

(aiding and abetting). On January 31, 2005, Fausto Veliz Urbina was sentenced to 78

months in federal prison. Thereafter, on March 11, 2010, Fausto Veliz Urbina was

deported from the United States to Mexico.

50.     I also learned that two pilots were receiving flight training for Plane #5 at

Simcom, an Orlando based flight simulator training company. The pilots were identified

as Ruben Cisneros Pena and Jorge Gonzalez Juarez, both Mexican nationals. On

November 13, 2012, HSI Supervisory Special Agent Deron Mangiocco and I interviewed

Cisneros and Gonzalez at Simcom.

51.     Cisneros indicated that Plane #5 was being purchased by a tequila

company in Mexico. Cisneros could not provide a name of the company or the

owner. Cisneros further indicated that he was invited to attend the training at Simcon by

Gonzalez, who was his flight instructor in Mexico. Cisneros was unable to provide any

other pertinent details as to the sale, use or operation of Plane #5.

52.     During his interview, Gonzalez indicated that Plane #5 was being

purchased by Tequila Embajador, a Mexican based tequila distillery. Gonzalez told me

that he was contacted by a representative of Tequila Embajador, who only identified himself as Alfonso (LNU), to meet with him for the purpose of an interview. The interview occurred on or about October, 26, 2012, at a Starbucks coffee shop in Guadalajara, Mexico and lasted for approximately 30 minutes. During this meeting, Alfonso offered Gonzalez a job flying a Socata TBM. Gonzalez told me that Alfonso did not identify the tail number registration of the Socata TBM.

53.     Alfonso also told Gonzalez that the owner of Plane #5 wanted to operate the aircraft within Mexico and that Jorge Zepeda was the owner of the tequila company and was purchasing the aircraft to transport his family. I then showed Gonzalez a picture of Fausto Veliz Urbina obtained from a DHS immigration database. I asked Gonzalez if he recognized the individual in the photograph and he immediately identified the individual in the photograph as "Alfonso" (LNU).

54.     SA Mangiocco and I again interviewed Gonzalez on November 14, 2012 at the HSI Orlando office. Gonzalez told me that after the conclusion of his meeting with Alfonso at Starbucks, Alfonso provided him with instructions on picking up a pre-paid bank card from Banco Mercantil del Norte. Alfonso instructed Gonzalez to go to a specific branch and to tell the bank that he was sent by a company named "Melun." Gonzalez also told me that Alfonso told him to pick up the insurance paperwork for Plane #5 at the same bank and that the insurance was being handled by a man named "Fausto Veliz." Gonzalez asked Alfonso if he needed to meet Fausto Veliz and Alfonso told him that it would not be necessary.

55.     On November 20, 2012, I obtained a copy of a Mexican passport for Fausto Veliz Urbina that was provided to Aircraft Guaranty.  I then compared the copy

of the passport picture of Fausto Veliz Urbina to the picture of him contained in his A-file and determined it was the same individual. Fausto Veliz Urbina was identified as the General Manager for Consorcio Melun S.A. de C.V. on a document within the trust that identified where the aircraft would be physically maintained in Mexico and the contact data for this location.

## II.    Funds Used to Purchase the Plane #5

56.    I reviewed an Escrow Settlement Statement obtained from Aero Space Reports which indicated that a total of $1,124,586 was deposited into an escrow account in order to purchase Plane #5. These deposits were received in the form of wire transfers from Waves Link General Tradin Ayal Al, which according to the Escrow Settlement sheet, is located in Dubai, United Arab Emirates.

57.    Specifically, on July 13, 2012, two wire transfers – $159,940.50 and $164,940.50 – were sent from Waves Link General Tradin Ayal Al to Aero Space Report's escrow account. Thereafter, on July 16, 2012, another five wire transfers were sent from Waves Link General Tradin Ayal Al to Aero Space Report's escrow account as follows: $179,941; $174,941; $164,941; $144,941; and $134,941.

58.    I spoke with Debbie Wilson, an escrow agent for Aero Space Reports, and she advised me the monetary transactions conducted to purchase for Plane #5 were unusual to her because the wire transfers came from a company in the United Arab Emirates, which appeared to have no known relation to Consorcio Melun S.A. de C.V., a Mexican company.

## A. Plane #6

59.     Additionally, the Escrow Settlement Statement sheet indicated that a Piper Seneca aircraft bearing U.S. registration N312SF ("Plane #6") was traded in and $585,000 from this trade-in was applied towards the purchase price of Plane #5.

60.     The Escrow Settlement Statement obtained from Aero Space Reports indicated that on June 15, 2012, Guillermo Torres Arce purchased Plane #6 for $585,000. I have reviewed emails from Aero Space Reports that reflect that De Leon acted as the broker for Plane #6 and also assisted in facilitating the incoming wire transfers from Mexico used to purchase the aircraft.

61.     The Escrow Settlement Statement indicated that the funds used to purchase Plane #6 came from three Mexican corporations: Comercializadora Integral De, Constructora Y Manta Nimiento (previously identified as being involved in the purchase of Plane #1), and Multiservicios Profe Sionales (previously identified as being involved in the purchase of Plane #1 and #4, all of which are illegally registered because Raul Espinoza is a Mexican National).

62.     Specifically, on May 15, 2012, a wire transfer in the amount of $30,000 was received by Aero Space Reports from Comercializadora Integral De. Thereafter, wire transfers were received by Aero Space Reports from Multiservicios Profe Sionales on June 5, 2012 and June 11, 2012, both in the amount of $100,000. Lastly, wire transfers were received by Aero Space Reports from Constructora Y Manta Nimiento on June 6, 2012 ($50,000); June 7, 2012 ($100,000); June 8, 2012 ($100,000); and two on June 12, 2012 ($75,400 and $30,000).

## III.    **CONCLUSION**

63.    Because a convicted cocaine trafficker was going to be operating Plane #5, false information about the identity of the owner of the aircraft was given to the pilots hired to fly the aircraft, the broker of the aircraft had previously been involved in the purchase of aircraft used in narcotics operations, the suspicious nature of the payments made to purchase Plane #5, as well as the involvement of corporations previously involved in the funding of aircraft used in narcotics operations to fund Plane #6, I have probable cause to believe that the funds used to purchase Plane #5 were traceable to or intended to facilitate a controlled substance exchange in violation of the Controlled Substances Act.

64.   Consequently, as required by Supp'l Rule G(2)(f), the facts set forth herein support a reasonable belief that the government will be able to meet its burden of proof at trial.  Specifically, for the reasons outlined above, probable cause exists to believe that the Defendant Aircraft (Plane #5) was purchased with: 1) proceeds traceable to a controlled substance exchange in violation of the Controlled Substances Act; and/or 2) money used and intended to be used to facilitate a violation of the Controlled Substances Act.  Thus, the Defendant Aircraft is subject to forfeiture to the United States pursuant to 21 U.S.C. § 881(a)(6).

Ryan Gorman, Special Agent
Department of Homeland Security, Homeland Security Investigations

State of Florida
County of Orange

Before me, the undersigned authority personally appeared, Special Agent Ryan Gorman, who having produced his Department of Homeland Security, Homeland Security Investigations credentials as identification and having being duly sworn, deposes and says that the foregoing Affidavit is true to the best of his knowledge, information and belief.  Witness my hand and official seal in the State of Florida, County of Orange this 29th day of July, 2013.

Notary Public
Commission Expires:



ANDREA Y. FRANKSON
Commission # EE 098011
Expires May 26, 2015
Bonded Thru Troy Fain Insurance 800-385-7019

21